**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

COURTNEY ROSS,
*on behalf of herself and others similarly situated*,

      Plaintiff,

          v.

COEXIST NUTRITION, LLC and
CO.EXIST NUTRITION CORP.,

      Defendants.

---

Case No.:

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

Plaintiff COURTNEY ROSS (hereinafter, "Plaintiff ROSS" or "Plaintiff"), individually and on behalf of all other persons similarly situated in New York and the United States, by her undersigned attorneys, pursuant to this Class Action Complaint against the Defendants, COEXIST NUTRITION, LLC and CO.EXIST NUTRITION CORP., alleges the following:

## <u>NATURE OF THE ACTION</u>

1.      This is a consumer protection action arising out of the deceptive and otherwise improper business practices that Defendants, COEXIST NUTRITION, LLC, and CO.EXIST NUTRITION, CORP., (hereinafter, "Defendants"), engages in through the packaging, marketing, and sale of the 14.82 ounce 22 Days Nutrition® Plant Power Protein Powder Supplement

(hereinafter, the "Product"). The Product is sold in a cylindrical container with the approximate dimensions of 7 inches in height, with 6.75 inches of internal vertical capacity and 15.5 inches in circumference, giving each container a volume of about 129 cubic inches with 14.81 oz. of protein powder per container.[1] The Product is regularly sold online and at brick-and-mortar stores such as Target. Below is an image of the Product:



2.      The Product is mass produced and packaged in a non-transparent cylindrical container of standardized size and composition, with a standardized quantity of 14.81 oz. of protein powder in each container.

---

[1] $\dfrac{(6.75 \text{ inches of verticalcapacity}) \text{x} (15.5 \text{ inches circumference})^2}{4 \text{ x } \pi}$ = Approximately 129 cubic inches.

3.     Defendants manufacture, market and sell the Product with non-functional slack-fill (unnecessary empty space) in violation of the Federal Food Drug & Cosmetic Act ("FDCA") Section 403(d) (21 U.S.C. 343(d)), the Code of Federal Regulations Title 21 part 100, *et seq.*, as well as the laws of New York State, the other 49 states, and the District of Columbia, which impose requirements identical to federal law. Defendants' containers are consequently made, formed or filled as to be misleading.

4.     Slack-fill is air or filler material within a packaged product. *Non-functional* slack-fill is slack-fill that serves no legitimate purpose, and misleads consumers about the quantity of food they are purchasing. When consumers purchase a package of Defendants' Product, they are getting less protein powder than they bargained for. They are effectively tricked into paying for air, because each Product container contains a large amount of non-functional slack-fill.



5.     The size of the Product container in comparison to the volume of the protein powder contained therein makes it appear to Plaintiff and Class members that they are buying more protein powder than is actually being sold. Plaintiff and Class members are denied the benefit of their bargain because they pay for full containers of the Product but actually receive containers that are mostly air.

6.     That the slack-fill in the Product is non-functional is proven in comparison to Defendants' own 14.3 oz. vanilla protein powder container, which is approximately 89% of the size of the Product, but contains more protein powder by volume (hereinafter "Smaller 22 Days"). Thus, Defendants cannot argue that the slack-fill in the Product is functional and necessary because it has itself succeeded in packaging more protein powder by volume in a smaller container.

7.     All Product containers are standardized to be mostly filled with air. Class members' Product containers were sized and filled to the same common standard.

8.     Plaintiff brings this proposed consumer class action on behalf of herself and all other persons who, from the applicable limitations period up to and including the present (the "Class Period"), purchased the Product for consumption and not for resale.

9.     During the Class Period, Defendants manufactured, marketed and sold the Product throughout the United States and the State of New York. Defendants purposefully sold the Product with non-functional slack-fill as part of a systematic practice.

10.     Defendants violated statutes enacted in each of the fifty states and the District of Columbia that are designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising. These statutes are:

1)  Alabama Deceptive Trade Practices Act, Ala. Statues Ann. § 8-19-1, *et seq.*;
2)  Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;
3)  Arizona Consumer Fraud Act, Arizona Revised Statutes, § 44-1521, *et seq.*;

4) Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;
5) California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;
6) Colorado Consumer Protection Act, Colo. Rev. Stat. § 6 - 1-101, *et seq.*;
7) Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;
8) Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;
9) District of Columbia Consumer Protection Procedures Act, D.C. Code § 28 3901, *et seq.*;
10) Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;
11) Georgia Fair Business Practices Act, § 10-1-390 *et seq.*;
12) Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statutes § 480 1, *et seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;
13) Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;
14) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS Section 505/1, *et seq.*;
15) Indiana Deceptive Consumer Sales Act, Indiana Code Ann. § 24-5-0.5-0.1, *et seq.*;
16) Iowa Consumer Fraud Act, Iowa Code § 714.16, *et seq.*;
17) Kansas Consumer Protection Act, Kan. Stat. Ann § 50 626, *et seq.*;
18) Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann § 365.020, *et seq.*;
19) Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401, *et seq.*;
20) Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*;
21) Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;
22) Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;
23) Michigan Consumer Protection Act, § 445.901, *et seq.*;
24) Minnesota Prevention of Consumer Fraud Act, Minn. Stat § 325F.68, *et seq.*, and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;
25) Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;
26) Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;
27) Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;
28) Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;
29) Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.*;
30) New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* ;
31) New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8 1, *et seq.*;
32) New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57 12 1, *et seq.*;
33) New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law § 349, *et seq.*, and New York False Advertising, N.Y. Gen. Bus. Law § 350, *et seq.*;
34) North Dakota Consumer Fraud Act, N.D. Cent. Code § 51 15 01, *et seq.*;
35) North Carolina Unfair and Deceptive Trade Practices Act, North Carolina General Statutes § 75-1, *et seq.*;
36) Ohio Deceptive Trade Practices Act, Ohio Rev. Code. Ann. § 4165.01. *et seq.*;
37) Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;
38) Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;
39) Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Penn. Stat. Ann. § 201-1, *et seq.*;
40) Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;
41) South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

5

*42)* South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37 24 1, *et seq.*;
*43)* Tennessee Trade Practices Act, Tennessee Code Annotated § 47-25-101, *et seq.*;
*44)* Texas Stat. Ann. § 17.41, *et seq.*, Texas Deceptive Trade Practices Act, *et seq.*;
*45)* Utah Unfair Practices Act, Utah Code Ann. § 13-5-1, *et seq.*;
*46)* Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;
*47)* Virginia Consumer Protection Act, Virginia Code Ann. §59.1-196, *et seq.*;
*48)* Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;
*49)* West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;
*50)* Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100. 18, *et seq.*;
*51)* Wyoming Consumer Protection Act, Wyoming Stat. Ann. § 40-12-101, *et seq.*

11.     Defendants have deceived Plaintiff and other consumers by inducing Plaintiff and Class members to reasonably rely on Defendants' misrepresentations and purchase the Product which they would not have purchased at the given price had they known the truth. Through these unfair and deceptive practices, Defendants have collected millions of dollars from the sale of its Product that it would not have otherwise earned. Plaintiff brings this action to stop Defendants' deceptive practice.

12.     Plaintiff expressly does not seek to enforce any state law that has requirements beyond those established by federal laws or regulations.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C § 1332(d)(1)(B), in which a member of the putative class is a citizen of a different state than Defendants, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

14.     The Court has jurisdiction over the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

15.     This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to New York Statute N.Y. CVP. Law § 302, because it conducts substantial business in this District. Some of

the actions giving rise to the Complaint took place in this District, and Plaintiff's claims arise out of Defendants operating, conducting, engaging in or carrying on a business or business venture in this state or having an office or agency in this state; committing a tortious act in this state; and causing injury to person or property in this state arising out of Defendants' acts and omissions outside this state. Additionally, this court has personal jurisdiction over Defendants because its Product is advertised, marketed, distributed, and sold throughout New York State; Defendants engage in the wrongdoing alleged in this Complaint throughout the United States, including in New York State; and Defendants have sufficient minimum contacts with New York and/or has intentionally availed itself of the markets in New York State, rendering the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. Moreover, Defendants is engages in substantial and not isolated activity within New York State.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, the Defendants have caused harm to class members residing in this District, and the Defendants is a resident of this District under 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

### Plaintiff

17.    Plaintiff ROSS is, and at all relevant times hereto has been, a citizen of the state of New York and a resident of Westchester County. On August 18, 2017, Plaintiff ROSS purchased a Product container containing 14.81 oz. of 22 Days protein powder for personal consumption. Plaintiff ROSS purchased in Westchester County, New York. Plaintiff ROSS purchased the Product for $29.99, and was financially injured as a result of Defendants'

7

deceptive conduct as alleged herein because she did not receive the quantity that she paid for and was promised. Plaintiff ROSS made her purchase in reliance on the size of the Product packaging and expected to receive a container of protein powder that was functionally full, but the container Plaintiff ROSS received contained approximately 56% slack-fill, most of which was non-functional slack-fill.

18.     As the result of Defendants' deceptive conduct as alleged herein, Plaintiff ROSS was injured when she paid full price for the Product but did not receive a full container. Plaintiff was economically injured by the shortfall in her Product container. Her injury was equivalent to the proportion of her purchase price that paid for non-functional slack-fill in the Product. Should Plaintiff ROSS encounter the Product in the future, she could not rely on the truthfulness of the packaging, absent corrective changes. Plaintiff ROSS would still be willing to purchase the Product in its current formulation.

### *Defendants*

19.     Defendant COEXIST NUTRITION, LLC is a corporation organized under the laws of Delaware with its headquarters at 7350 SW 48th Street Miami, Florida, 33155. Defendant manufactures, packages, distributes, advertises, markets, and sells the Product to customers nationwide. Defendant's address for service of process is Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801.

20.     Defendant CO.EXIST NUTRITION CORP. is a corporation organized under the laws of Florida with its headquarters at 7350 SW 48th Street Miami, Florida, 33155. Defendant's address for service of process is CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

21.     On February 15, 2017 CO.EXIST NUTRITION CORP. filed a letter with the Florida Secretary of state memorializing its intent to contribute all of its assets to COEXIST NUTRITION, LLC in exchange for all of the membership interests of COEXIST NUTRITION, LLC. Upon completion, CO.EXIST NUTRITION CORP. would become the sole member of COEXIST NUTRITION, LCC.

22.     The labeling, packaging, and advertising for the Product, relied upon by Plaintiff, were prepared and/or approved by Defendants and its agents, and were disseminated by Defendants and its agents through advertising containing the misrepresentations alleged herein. Such labeling, packaging and advertising were designed to encourage consumers to purchase the Product and misled reasonable consumers, including Plaintiff and the Class, into purchasing the Product. Defendants own, market and distribute the Product, and create and/or authorized the unlawful, fraudulent, unfair, misleading and/or deceptive labeling, packaging and advertising for the Product.

## FACTUAL ALLEGATIONS

### Identical Federal and State Law Prohibit Misbranding Foods by Packaging Them With Non-Functional Slack-Fill

23.     Under § 403(d) of the FDCA (21 U.S.C. § 343(d)), a food shall be deemed to be misbranded "[i]f its container is so made, formed, or filled as to be misleading."

24.     The FDA has implemented § 403(d) through 21 C.F.R. § 100.100, which states:

In accordance with section 403(d) of the act, a food shall be deemed to be misbranded if its container is so made, formed, or filled as to be misleading.

(a) A container that does not allow the consumer to fully view its contents shall be considered to be filled as to be misleading if it contains nonfunctional slack-fill. Slack-fill is the difference between the actual capacity of a container and the volume of product contained therein. Nonfunctional slack-fill is the empty space in a package that is filled to less than its capacity for reasons other than:

(1) Protection of the contents of the package;

(2) The requirements of the machines used for enclosing the contents in such package;

(3) Unavoidable product settling during shipping and handling;

(4) The need for the package to perform a specific function (e.g., where packaging plays a role in the preparation or consumption of a food), where such function is inherent to the nature of the food and is clearly communicated to consumers;

(5) The fact that the product consists of a food packaged in a reusable container where the container is part of the presentation of the food and has value which is both significant in proportion to the value of the product and independent of its function to hold the food, e.g., a gift product consisting of a food or foods combined with a container that is intended for further use after the food is consumed; or durable commemorative or promotional packages; or

(6) Inability to increase level of fill or to further reduce the size of the package (e.g., where some minimum package size is necessary to accommodate required food labeling (excluding any vignettes or other non-mandatory designs or label information), discourage pilfering, facilitate handling, or accommodate tamper-resistant devices).

25.     The FDA has defined non-functional slack-fill as any slack-fill in excess of that required to achieve the functional purposes listed in 21 C.F.R. § 100.100(a):

FDA advises that the exceptions to the definition of "nonfunctional slack-fill" in § 100.100(a) apply to that portion of the slack-fill within a container that is necessary for, or results from, a specific function or practice, e.g., the need to protect a product. Slack-fill in excess of that necessary to accomplish a particular function is nonfunctional slack-fill. Thus, the exceptions in § 100.100(a) provide only for that amount of slack-fill that is necessary to accomplish a specific function. FDA advises that these exceptions do not exempt broad categories of food, such as gift products and convenience foods, from the requirements of section 403(d) of the act. For example, § 100.100(a)(2) recognizes that some slack-fill may be necessary to accommodate requirements of the machines used to enclose a product in its container and is therefore functional slack-fill. However, § 100.100(a)(2) does not exempt all levels of slack-fill in all mechanically packaged products from the definition of nonfunctional slack-fill.

58 FR 64123, 64126 (emphasis added).

26.     Thus, the possibility that some portion of the slack-fill in Defendants' Product may be justified as functional based on the exemptions in §100.100(a) does not justify slack-fill that is in excess of that required to serve a legitimate purpose—protecting contents,

10

accommodating the machines that enclose the contents, accommodating settling, etc. Such slack-fill serves no purpose other than to mislead consumers about the quantity of food they are actually purchasing. *See Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 405 (E.D.N.Y. 2010) ("Misleading consumers is not a valid reason to package a product with slack-fill. *See* 21 C.F.R. § 100.100(a)(1–6).").

27.     The food labeling laws and regulations of New York impose requirements that mirror federal law.

28.     New York Agm. Law § 201 specifically provides that "[f]ood shall be deemed to be misbranded . . . [i]f its container is so made, formed, colored or filled as to be misleading." Moreover, Part 259.1 of Title 1 of the New York Codes, Rules and Regulations (1 NYCRR § 259.1), incorporates by reference the regulatory requirements for food labeling under the FDCA:

> "For the purpose of the enforcement of article 17 of the Agriculture and Markets Law, and except where in conflict with the statutes of this State or with rules and regulations promulgated by the commissioner, the commissioner hereby adopts the current regulations as they appear in title 21 of the *Code of Federal Regulations* (revised as of April 1, 2013) . . . in the area of food packaging and labeling as follows: . . . (2) Part 100 of title 21 of the *Code of Federal Regulations* [21 C.F.R. 100 et seq.], containing Federal definitions and standards for food packaging and labeling *General* at pages 5-10. . . ."

1 NYCRR § 259.1(a)(2).

29.     Courts have noted the incorporation of FDA regulations into New York law in evaluating claims brought under NY GBL § 349. *See Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG) (RML), 2010 U.S. Dist. LEXIS 73156, at *13 (E.D.N.Y. July 21, 2010) ("New York's Agriculture and Marketing law similarly provides in relevant part that food shall be deemed misbranded '[i]f its labeling is false or misleading in any particular,' and incorporates the FDCA's labeling provisions"); *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-04697 (CM), 2016

U.S. Dist. LEXIS 149795, at *11 (S.D.N.Y. Oct. 26, 2016) ("Here [in a slack-fill case brought under NY GBL § 349], New York law expressly incorporates the standard imposed by the FDCA.").

**Defendants' Product Contains Non-Functional Slack-Fill**

30.     The 22 Days Product package is a container that is approximately 7 inches in height with 6.75 inches of vertical capacity and a circumference of 15.5 inches with a volume of approximately 129 cubic inches. The protein powder only fills the bottom 3 inches of the container, leaving 3.75 vertical inches of empty air.[2] The protein powder occupies 44%[3] of the container; air occupies the other 56% of the container, leaving 56% slack-fill[4]:

---

[2] 6.75 inches of vertical capacity – 3 inches of protein powder = 3.75 inches of slack-fill.

[3] $\dfrac{3 \text{ inches of protein powder}}{6.75 \text{ inches of vertical capacity}}$ = Approximately 44% of the Product container is filled with protein powder.

[4] $\dfrac{3.75 \text{ inches of slack-fill}}{6.75 \text{ inches of vertical capacity}}$ = Approximately 56% slack-fill is in the Product container.



31.     While some of Defendants' slack-fill may have functional justifications related to packaging requirements or the effects of settling, Defendants' total slack-fill far exceeds the amount necessary, and almost all of the slack-fill is therefore nonfunctional. This is proven by the fact that the slack-fill in Defendants' Product is significantly greater than the slack-fill in the packaging of its Smaller 22 Days container, which is about 88% of the size of the Product container, but contains more protein powder by volume. Below is a comparison of the slack-fill in the Product (left) with the slack-fill in the Smaller 22 Days container (right):



Approximate Height of
Protein powder: 3.25 inches

Approximate Height of
Protein Powder: 3 inches

32.     The dimensions of the Smaller 22 Days container are approximately 6 inches in vertical capacity and 15.5 inches in circumference with a volume of 115 cubic inches.[5] The protein powder inside the Smaller 22 Days container fills approximately 3.25 inches of that container, leaving only about 2.75 inches of empty space at the top of the container, i.e. 46%[6] slack-fill, less than the 56% slack-fill in the Product.

33.     The dimensions of the protein powder in the Smaller 22 Days container are 3.25 inches in height by 15.5 inches in circumference, yielding a volume of approximately 62 cubic

---

5 $\frac{(6 \text{ inches of vertical capacity}) \text{x} (15.5 \text{ inches circumference})^2}{4 \text{ x } \pi}$ = Approximately 115 cubic inches.

6 $\frac{6 \text{ inches of vertical capacity} - 3.25 \text{ inches of protein powder}}{6 \text{ inches of vertical capacity}}$ = Approximately 46% slack-fill.

inches.[7] By contrast, the dimensions of the protein powder in the Product are 3.0 inches in height by 15.5 inches in circumference, yielding a volume of approximately 57 cubic inches.[8] Defendants cannot plausibly argue that it could not fit the protein powder in the Product container into a smaller container, because it has already done exactly this, placing a greater volume of protein powder in a container that is actually smaller than the Product container.

34.     The Smaller 22 Days container has 46% slack-fill. The slack-fill in the Smaller 22 Days container may or may not all be functional, but it demonstrates a container of 22 Days protein powder needs no more than 46% slack-fill. Slack-fill in excess of 46% in the Product is **<u>certainly</u>** non-functional, as the comparable Smaller 22 Days container demonstrates, so all slack-fill in the Product in excess of 46% is certainly non-functional. However, Defendants fraudulently induce sales at inflated prices by tricking consumers into believing that they are purchasing a container containing only: a) protein powder and b) the amount of slack-fill that is necessary (i.e. no more than 46% slack-fill). The Product containers have significant amounts of non-functional slack-fill instead of protein powder, so consumers who purchased the Product received far less protein powder than they bargained for.

35.     Competitors' products also demonstrate that the Product contains non-functional slack-fill. For example, EAS® Whey + Casein Protein Powder (hereinafter, "EAS") is sold in containers that are 8.5 inches tall (with 8.25 inches of vertical space internally) and 15.5 inches

---

[7] $\frac{(3.25\ \text{inches of vertical capacity}) \times (15.5\ \text{inches circumference})^2}{4 \times \pi}$ = Approximately 62 cubic inches.

[8] $\frac{(3\ \text{inches of vertical capacity}) \times (15.5\ \text{inches circumference})^2}{4 \times \pi}$ = Approximately 57 cubic inches.

in circumference with an approximate volume of 158 cubic inches[9]. EAS containers have 6.75 inches of product and only about 1.5 inches of air, making approximately 82%[10] full.



[9] $\frac{(8.25 \text{ inches of verticalcapacity}) \times (15.5 \text{ inches circumference})^2}{4 \times \pi}$ = Approximately 158 cubic inches.

[10] $\frac{6.75 \text{ inches of protein powder}}{8.25 \text{ inches of vertical capacity}}$ = Approximately 82%.

16



36.     This shows that only 18% of a protein powder container, at most, needs to be air as part of the process of manufacturing and shipping protein powder containers. While some of the air in the EAS container may be non-functional slack-fill, the EAS container shows that all of the slack in excess of 82% in a protein powder container is certainly unnecessary non-functional slack fill.

**A Reasonable Consumer Would Rely Upon And Be Deceived By Defendants' Misleading Packaging**

37.     Plaintiff and Class members viewed Defendants' deceptive and misleading Product packaging, and reasonably relied in substantial part on its implicit representations of quantity and volume when purchasing the Product. Plaintiff and Class members were thereby

deceived into deciding to purchase the Product. The perceived volume of the protein powder Plaintiff and Class were receiving was a material factor in their evaluation of the Product's value.

38.     The Product is misbranded regardless of any disclosures about contents settling and regardless of whether or not weight is labeled accurately. Under Federal regulations, "label statements cannot correct nonfunctional or misleading fill." Misleading Containers; Nonfunctional Slack-Fill, 58 Fed. Reg. 64123-01, 64129 (Dec. 6, 1993) (codified at 21 C.F.R. pt. 100).

39.     Even if Defendants' net weight disclosures are accurate, it does not eliminate the basic deception. The FDA has confirmed this in unequivocal terms:

> FDA disagrees with the comments that stated that net weight statements protect against misleading fill. FDA finds that <u>the presence of an accurate net weight statement does not eliminate the misbranding</u> that occurs when a container is made, formed, or filled so as to be misleading.

58 FR 64123, 64128 (emphasis added).

40.     The FDA's findings are grounded in congressional intent:

> Section 403(e) of the act requires packaged food to bear a label containing an accurate statement of the quantity of contents. This requirement is separate and in addition to section 403(d) of the act. <u>To rule that an accurate net weight statement protects against misleading fill would render the prohibition against misleading fill in section 403(d) of the act redundant</u>. In fact, Congress stated (S. Rept. No. 493, 73d Cong., 2d sess. 9 (1934)) in arriving at section 403(d) of the act that that section is "intended to reach deceptive methods of filling where the package is only partly filled and, <u>despite the declaration of quantity of contents on the label</u>, creates the impression that it contains more food than it does." Thus, Congress clearly intended that failure to comply with either section would render a food to be misbranded.

58 FR 64123, 64128-64129 (emphasis added).

41.     Congress' intent was based on its' investigation of consumer behavior:

> Consumers develop expectations as to the amount of product they are purchasing based, at least in part, on the size of the container. The congressional report that accompanied the FPLA stated: <u>"Packages have replaced the salesman</u>. Therefore, it is urgently required that the information set forth on these packages be

sufficiently adequate to apprise the consumer of their contents and to enable the purchaser to make value comparisons among comparable products" (H.R. 2076, 89th Cong., 2d sess., p. 7 (September 23, 1966)). <u>Thus, packaging becomes the "final salesman" between the manufacturer and the consumer, communicating information about the quantity and quality of product in a container.</u> Further, Congress stated (S. Rept. 361, supra at 9) that <u>"Packages only partly filled create a false impression as to the quantity of food which they contain despite the declaration of quantity of contents on the label."</u>

58 FR 64123, 64131 (emphasis added).

42.     Congress recognizes that the size of a package is in and of itself a kind of sales pitch, even if not made with words or numbers. Thus, consumers can reasonably rely on packaging size as a representation of quantity regardless of whatever is printed on the label.

43.     The size of the Product packaging makes a representation about the quantity of its content, independent of the text on the Product labels and regardless of the label texts' accuracy or inaccuracy. For Defendants' Product, this representation is misleading.

44.     New York courts agree with the FDA's analysis. *See Izquierdo v Mondelez Intl., Inc.*, 2016 US Dist LEXIS 149795, at *16 [SDNY Oct. 26, 2016, No. 16-cv-04697 (CM)]. In *Izquierdo* the court states that the defendant "does not cite a single controlling decision of law standing for the proposition that food packaging is incapable of being materially misleading if it displays the net weight and lists the number of pieces inside of the package. This Court is unwilling to manufacture such a precedent here." *Id.*

45.     Even if consumers suspected that same protein powder products contain significant slack-fill, this would not reduce the impact of Defendant's deception. The FDA has stated that "although consumers may become used to the presence of nonfunctional slack-fill in a particular product or product line, the recurrence of slack-fill over an extended period of time does not legitimize such slack-fill if it is nonfunctional." 58 FR 64123, 64131.

46.     At the point of sale, Plaintiff and Class members did not know, and had no reason to know, that the Product contained non-functional slack-fill as set forth herein, and would not have bought the Product at the given prices had they known the truth about them.

47.     Defendants' Product packaging was a material factor in Plaintiff's and Class members' decisions to purchase the Product because reasonable consumers would attach importance to the quantity of food they believe they are purchasing.

48.     Plaintiff and the Class reasonably relied on the size of the Product's packaging to infer how much food they were purchasing and reasonably believed that the containers were filled as closely to capacity as functionally possible.

49.     Defendants might argue that Plaintiff and the Class should not have relied on the packaging's size to infer its contents because they could have manipulated the packaging in order to acquire a sense of the slack-fill therein (e.g., shaking the package to hear how much noise the protein powder makes), but the FDA has stated that such manipulation cannot be reasonably expected of consumers:

> FDA advises that the entire container does not need to be transparent to allow consumers to fully view its contents, i.e., a transparent lid may be sufficient depending on the conformation of the package. On the other hand, FDA finds that devices, such as a window at the bottom of a package, that require consumers to manipulate the package, e.g., turning it upside down and shaking it to redistribute the contents, do not allow consumers to fully view the contents of a container. FDA finds that such devices do not adequately ensure that consumers will not be misled as to the amount of product in a package. Therefore, such foods remain subject to the requirements in § 100.100(a) that slack-fill in the container be functional slack-fill.

58 FR 64123, 64128.

50.     Here, the FDA was contemplating a scenario in which manipulating a package might permit an accurate visual estimate of its contents. This is clearly impossible in the case of Defendants' wholly non-transparent packaging, which can only provide audial clues as to the

Product's slack-fill. But the same basic principle applies: the possibility that manipulating a package might yield additional insight into its contents does not exculpate non-functional slack-fill (just as accurate net weight disclosures do not). The possibility of manipulating the package to discover the truth about it does not mitigate the false statement conveyed by the disproportionately large size of the product packaging. Likewise the existence of true label statements regarding weight and quantity (if any) do not diminish Defendants' wrongdoing in using a false and misleading packaging size.

**Plaintiff and the Class Were Injured as a Result of Defendants' Deceptive Conduct**

51.    Plaintiff and Class members were injured as the result of Defendants' deceptive conduct because they paid money for less Product than Defendants represented they would be receiving. Plaintiff and the Class were deprived of the benefit of their bargain.

52.    EAS protein powder demonstrates that a container of 22 Days protein powder should contain **at most** 18% functional slack-fill, and therefore should contain **at least** 82% protein powder. However Plaintiff ROSS paid $29.99 for a container of the Product and her container was only about 44% full of protein powder, with slack-fill of about 56%.

53.    Since the Product container was 44% full when it should have been **at least** 80% full, Plaintiff received **at most** 54%[11] of what she bargained for. Accordingly, **at least** 46%[12] of the purchase price, or about $13.80[13] was unlawfully taken.

54.     In order for Plaintiff and Class members to be made whole, they must be compensated in an amount of the proportion of the purchase price equal to the percentage of non-functional slack-fill in the Product, which is equivalent to the amount of product Plaintiff and the

---

[11]    $\frac{44\% \text{ actual fill}}{82\% \text{ minimum expected fill}}$ = Approximately 54%.

[12] 100% - 54% = 46%.

[13] 46% x $29.99 = $13.80.

Class paid for that Defendants did not-deliver. *See*, e.g., *Lazaroff v. Paraco Gas Corp.*, 2011 NY Slip Op 52541(U), ¶ 6, 38 Misc. 3d 1217(A), 1217A, 967 N.Y.S.2d 867, 867 (Sup. Ct.) ("Plaintiff alleges that, had he understood the true amount of the product, he would not have purchased it, and that he and the purported members of the class paid a higher price per gallon/pound of propane and failed to receive what was promised and/or the benefit of his bargain, i.e., a full 20 pound cylinder and the amount of propane he was promised . . . Thus, plaintiff has properly alleged injury. Accordingly, the court finds that the plaintiff has stated a claim for a violation of GBL § 349."); *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 406 (E.D.N.Y. 2010) ("Plaintiff alleges that, had she understood 'the true amount of the product,' she 'would not have purchased' it . . . Thus, Plaintiff has properly alleged injury. Accordingly, Plaintiff's § 349 claim survives Defendant's motion); *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489 (KMK), 2016 U.S. Dist. LEXIS 107097, at *51-52 (S.D.N.Y. Aug. 11, 2016) ("Indeed, in his Complaint, Plaintiff seeks monetary damages on the grounds that he 'would not have paid the premium price he paid' to buy the Product had he 'known the truth.' . . . Case law makes clear that this is sufficient at the motion-to-dismiss phase for a § 349 claim to survive.").

## CLASS ACTION ALLEGATIONS

55.     Plaintiff ROSS brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons or entities in the United States who made retail purchases of the Product during the applicable limitations period, and/or such subclasses as the Court may deem appropriate (the "Nationwide Class").

56.     In the alternative, Plaintiff ROSS seeks to represent the following Class:

> All persons who made retail purchases of the Product in New York during the applicable limitations period, and/or such subclasses as the Court may deem appropriate (the "New York Class").

22

57.     The proposed Classes exclude current and former officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, Defendants' legal representatives, heirs, successors, assigns, and any entity in which they have or have had a controlling interest, and the judicial officer to whom this lawsuit is assigned.

58.     Class members are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through the appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Classes. Other members of the Classes may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, or by advertisement, using the form of notice similar to that customarily used in class actions such as this.

59.     Plaintiff's claims are typical of the claims Class members as they all are similarly affected by Defendants' wrongful conduct.

60.     Plaintiff will fairly and adequately protect the interests of the Class members in that Plaintiff has no interests antagonistic to them. Plaintiff has retained experienced and competent counsel.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages sustained by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the Class members to individually seek redress for the wrongful conduct alleged herein.

62.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members. These include:

i.   Whether Defendants labeled, packaged, marketed, advertised and/or sold the Product to Plaintiff and Class members using false, misleading and/or deceptive packaging and labeling;

ii.   Whether Defendants' actions constitute violations of 21 U.S.C. § 343(d);

iii.   Whether Defendants omitted and/or misrepresented material facts in connection with the labeling, packaging, marketing, advertising and/or sale of its Product;

iv.   Whether Defendants' labeling, packaging, marketing, advertising and/or selling of its Product constituted an unfair, unlawful or fraudulent practice;

v.   Whether the packaging of the Product during the class period contained unlawful non-functional slack-fill;

vi.   Whether, and to what extent, injunctive relief should be imposed on Defendants to prevent future misconduct;

vii.   Whether Class members have sustained damages as a result of Defendants' wrongful conduct;

viii.   Whether Defendants purposely chose non-transparent Product packaging so that Plaintiff and Class members would not be able to see the amount of slack-fill contained in the Product;

ix.   The appropriate measure of damages and/or other relief.

63.   The membership of the Classes is readily definable, and prosecution of this action as a class action will reduce the possibility of repetitious litigation. Plaintiff knows of no difficulty which will be encountered in the management of this litigation that would preclude its maintenance as a class action.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by any individual Class member are too small to make it economically feasible for an individual Class member to prosecute a separate action, and it is desirable for judicial efficiency to concentrate the litigation of the claims in this forum. Furthermore, the adjudication of this controversy through a class action will prevent the potentially inconsistent and conflicting adjudications of the claims asserted herein. There will be no difficulty in the management of this action as a class action.

65.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

66.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Classes predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

67.     The prosecution of separate actions by individual Class members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. Additionally, individual actions may be dispositive of the interest of all Class members, although certain Class members are not parties to such actions.

68.     Defendants' conduct is generally applicable to the Classes as a whole and Plaintiff seeks, *inter alia*, equitable remedies with respect to the Classes as a whole. As such, Defendants' systematic policies and practices make declaratory relief with respect to the Classes as a whole appropriate.

# CAUSES OF ACTION

## COUNT I

**INJUNCTION FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
(DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)**

**(Brought on behalf of the Nationwide Class, in conjunction with the substantively similar
consumer protection law of other states and the District of Columbia to the extent New
York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of
the New York Class)**

69.     Plaintiff ROSS realleges and incorporates herein by reference the allegations

contained in all preceding paragraphs, and further alleges as follows:

70.     Plaintiff ROSS brings this claim individually and on behalf of the other members

of the Class for an injunction for violations of New York's Deceptive Acts or Practices Law,

General Business Law ("NY GBL") § 349.

71.     NY GBL § 349 provides that "deceptive acts or practices in the conduct of any

business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

72.     Under the New York Gen. Bus. Code § 349, it is not necessary to prove justifiable

reliance. ("To the extent that the Appellate Division order imposed a reliance requirement on

General Business Law [§] 349 . . . claims, it was error. Justifiable reliance by the plaintiff is not

an element of the statutory claim." *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941

(N.Y. App. Div. 2012) (internal citations omitted)).

73.     The practices employed by Defendants, whereby Defendants advertised,

promoted, marketed and sold its Product in packaging containing non-functional slack-fill are

unfair, deceptive and misleading and are in violation of the NY GBL § 349. Moreover, New

York State law broadly prohibits the misbranding of foods in language identical to that found in

regulations promulgated pursuant to the FDCA § 403 (21 U.S.C. 343(d)). Under New York

26

Agm. Law § 201, "[f]ood shall be deemed to be misbranded … If its container is so made, formed, colored or filled as to be misleading."

74.     The foregoing deceptive acts and practices were directed at consumers.

75.     Defendants should be enjoined from packaging its Product with non-functional slack-fill, as described above, pursuant to NY GBL § 349.

76.     Absent an injunction, Plaintiff ROSS is at risk of continued injury because she can no longer rely on Defendants' packaging, even if the nonfunctional slack-fill is corrected. Plaintiff ROSS might hesitate to purchase Defendants' products even if it ceases its unlawful packaging practices and begins packaging its products without non-functional slack-fill. If the products are no longer sold with non-functional slack-fill, then Plaintiff ROSS could not take advantage of those products because she has been misled into believing that the products have non-functional slack-fill. The 9th Circuit has recently embraced this approach:

> We hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an "actual and imminent, not conjectural or hypothetical" threat of future harm. [*Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 129 S. Ct. 1142, 1148 (2009).] Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future. In some cases, the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to. *See, e.g.*, [*Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012)]; *Lilly v. Jamba Juice Co.*, No. 13-cv-02998-JT, 2015 U.S. Dist. LEXIS 34498, 2015 WL 1248027, at *4 (N.D. Cal. Mar. 18, 2015) ("[U]nless the manufacturer or seller has been enjoined from making the same representation, [the] consumer . . . won't know whether it makes sense to spend her money on the product.").

*Davidson v. Kimberly-Clark Corp.,* 873 F.3d 1103, 1115 (9th Cir. 2017).

77.     The Court should follow the lead of California Federal Courts and recognize that a plaintiff may be injured after she learns of a manufacturer's deception, even though she is

unlikely to fall victim to the exactly the same scheme again in exactly the same manner. To hold otherwise would immunize manufacturers and render injunctive relief impossible in consumer fraud class action lawsuits – if learning of a deception removed a Plaintiff's standing to seek an injunction, then wrongdoers could violate the law with impunity, defeating the purpose of consumer protection statutes.

78. Plaintiff ROSS, on behalf of herself and all others similarly situated, respectfully demands a judgment enjoining Defendants' conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## COUNT II

### DAMAGES FOR VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349 (DECEPTIVE AND UNFAIR TRADE PRACTICES ACT)

**(Brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection law of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

79. Plaintiff ROSS realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

80. Plaintiff ROSS brings this claim individually and on behalf of the other members of the Class for violations of NY GBL § 349.

81. Any person who has been injured by reason of any violation of NY GBL § 349 may bring an action in her own name to enjoin such unlawful acts or practices, an action to recover her actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the Defendants willfully or

knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

82.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by misbranding its Product so that it appears to contain more in the packaging than is actually included.

83.     The practices employed by Defendants, whereby Defendants advertised, promoted, marketed and sold its Product in packages containing non-functional slack-fill are unfair, deceptive and misleading and are in violation of the NY GBL § 349, New York Agm. Law § 201 and the FDCA (21 U.S.C. § 343(d)) in that said Product is misbranded.

84.     The foregoing deceptive acts and practices were directed at consumers.

85.     Plaintiff ROSS and the other Class members suffered a loss as a result of Defendants' deceptive and unfair trade practices. Specifically, as a result of Defendants' deceptive and unfair acts and practices, Plaintiff ROSS and the other Class members suffered monetary losses from the purchase of Product, i.e., receiving less than the capacity of the packaging due to non-functional slack-fill in the Product. In order for Plaintiff ROSS and Class members to be made whole, they must receive a refund of the purchase price of the Product equal to the percentage of non-functional slack-fill in it.

## COUNT III

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §§ 350 AND 350-a(1) (FALSE ADVERTISING)

**(Brought on behalf of the Nationwide Class, in conjunction with the substantively similar consumer protection law of other states and the District of Columbia to the extent New York law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

86.     This claim is brought on behalf of Plaintiff ROSS and members of the Class against Defendants.

87.     Plaintiff ROSS realleges and incorporates by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

88.     Defendants have been and/or re engaged in the "conduct of . . . business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

89.     New York Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of . . . representations [made] with respect to the commodity. . . . " N.Y. Gen. Bus. Law § 350-a(1).

90.     Pursuant to the FDCA as implemented through 21 C.F.R. § 100.100, package size is an affirmative representation of quantity. Thus, the non-functional slack-fill in Defendants' Product constituted false advertising as to the quantity of protein powder contained therein. Defendants caused this false advertising to be made and disseminated throughout New York and the United States. Defendants' false advertising was known, or through the exercise of reasonable care should have been known, by Defendants to be deceptive and misleading to consumers.

91.     Defendants' affirmative misrepresentations were material and substantially uniform in content, presentation, and impact upon consumers at large. Consumers purchasing the Product were, and continue to be, exposed to Defendants' material misrepresentations.

92.     Defendants have violated N.Y. Gen. Bus. Law § 350 because its misrepresentations and/or omissions regarding the Product, as set forth above, were material and likely to deceive a reasonable consumer.

93.     Plaintiff ROSS and members of the Class have suffered an injury, including the loss of money or property, as a result of Defendants' false and misleading advertising. In purchasing the Product, Plaintiff ROSS and members of the Class relied on the misrepresentations regarding the quantity of the Product that was actually protein powder rather than non-functional slack-fill. Those representations were false and/or misleading because the Product contains substantial hidden non-functional slack-fill. Plaintiff and the Class were deprived of the benefit of their bargains when they purchased the Product and received mostly air.

94.     Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff ROSS and members of the Class seek monetary damages (including actual, minimum, punitive, treble, and/or statutory damages), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV

## COMMON LAW FRAUD

**(Brought on behalf of the Nationwide Class, in conjunction with the substantively similar common law of other states and the District of Columbia to the extent New York common law is inapplicable to out-of-state Class members, or, in the alternative, on behalf of the New York Class)**

95.     Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

96.     Through its product packaging, Defendants intentionally made materially false and misleading representations regarding the quantity of protein powder that purchasers were actually receiving.

97.     Plaintiff and Class members were induced by, and relied upon, Defendants' false and misleading representations and did not know the truth about the Product at the time they purchased it.

98.     Defendants knew of its false and misleading representations. Defendants nevertheless continued to promote and encourage customers to purchase the Product in a misleading and deceptive manner, intending that Plaintiff and the Class rely on its misrepresentations.

99.     Had Plaintiff and the Class known the actual amount of protein powder they were receiving, they would not have purchased the Product at the full price they were charged.

100.    Plaintiff and Class members have been injured as a result of Defendants' fraudulent conduct.

101.    Defendants are liable to Plaintiff and Class members for damages sustained as a result of Defendants' fraud. In order for Plaintiff and Class members to be made whole, they need to receive a refund compensating them for the shortfall in the Products they purchased.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against Defendants, as follows:

a.  An Order that this action be maintained as a class action and appointing Plaintiff as representative of the Nationwide Class or, in the alternative, the New York Class;

b.  An Order appointing the undersigned attorney as class counsel in this action;

c.  Restitution and disgorgement of all amounts obtained by Defendants as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

d.  All recoverable compensatory and other damages sustained by Plaintiff and the Class;

e.  Actual and/or statutory damages for injuries suffered by Plaintiff and the Class and in the maximum amount permitted by applicable law;

f.  An order (i) requiring Defendants to immediately cease its wrongful conduct as set forth in this Complaint; (ii) enjoining Defendants from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (iii) ordering Defendants to engage in a corrective advertising campaign; and (iv) requiring Defendants to reimburse Plaintiff and all members of the Class in an amount up to the purchase price of the Product;

g.  Statutory pre-judgment and post-judgment interest on any amounts;

h.  Payment of reasonable attorneys' fees and costs; and

i.  Such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: January 23, 2018

Respectfully submitted,

/s/ *C.K. Lee*
By:  C.K. Lee, Esq.

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
30 East 39th Street, Second Floor
New York, NY 10016
Tel.: 212-465-1180
Fax: 212-465-1181
*Attorneys for Plaintiff and the Class*